UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**SONY ROY, individually, and
SONY ROY and RAYMONDE L. ROY,
husband and wife,**

      **Plaintiffs,**

v.                                                                              Case No. 3:06cv95/MCR/EMT

**BOARD OF COUNTY COMMISSIONERS,
WALTON COUNTY, FLORIDA, or, alternatively,
KENNETH PRIDGEN, LARRY JONES,
ROSIER "RO" CUCHENS, CINDY MEADOWS,
SCOTT BRANNON, in their official capacities
as Commissioners of Walton County;
PAT BLACKSHEAR, individually;
KENNETH C. VOGEL, individually;
MARGARET "MEG" NELSON, f/k/a
MARGARET N. STEVENSON, individually; and
CHARLES A. WEBB, III, individually,**

      **Defendants.**[1]
_____/

## ORDER

This case involves the proposed development of real property in Walton County, Florida, owned by plaintiffs Sony and Raymonde Roy ("plaintiffs" or "the Roys"). Alleging

---

[1] Since the filing of plaintiffs' third amended complaint, Rosier "Ro" Cuchens has been replaced on the Walton County Board of County Commissioners by Sara Commander. Pursuant to the court's order of November 9, 2007, Commissioner Commander was substituted for Commissioner Cuchens. Additionally attorney Kenneth Goldberg ("Goldberg") was originally named as a defendant in this case but on March 14, 2007, plaintiffs voluntarily dismissed their claims against him.

they have been prevented from fully developing the property by the discriminatory actions of the defendants, the Roys assert various constitutional and statutory violations for which they seek damages, a declaratory judgment, attorneys' fees, and other relief. Pending are defendants' motions for summary judgment and plaintiffs' cross-motion for partial summary judgment. Also pending are the motions of defendants Nelson, Vogel, and Webb for leave to amend their answers. The court heard oral argument on the motions on September 25, 2008. For the reasons that follow, defendants' motions for summary judgment are GRANTED, plaintiffs' cross-motion for partial summary judgment is DENIED, and defendants' motions for leave to amend are DENIED as moot.

**BACKGROUND**[2]

Plaintiffs, a married couple originally from Haiti, are residents of Georgia and citizens of the United States. They are black. The Roys own property in Walton County along Route 30A in an area that historically has been racially segregated. The Roys sought to build a subdivision on the property called Chateaux de Paris which they intended to market substantially but not exclusively to blacks, including sports figures and professionals. Mr. Roy ("Roy") and his wife also planned to build their own home on one of the lots. On May 4, 2004, the Roys obtained a final development order for the property from defendant Walton County Board of County Commissioners ("the County") for a seven parcel subdivision. The order permitted the construction of houses three storeys in height, ordinary utilities and roadway improvements, common areas, a front wall, and perimeter fencing. Roy (and Chateaux de Paris, LLC, a Georgia development company working under a development agreement with Roy) subsequently began construction.

According to the Roys, during construction defendants Kenneth C. Vogel ("Vogel") and Margaret "Meg" Nelson ("Nelson") informed him that his plan to build three storey

---

[2] On cross-motions for summary judgment, the court must construe facts and draw inferences "in favor of the party against whom the motion under consideration is made." *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008) (internal quotation marks omitted). The court does so here in setting out the facts that follow in this Background section, taking those facts from the pleadings, the discovery and disclosure materials, and the affidavits presented as part of the summary judgment record. Fed.R.Civ.P. 56(c); N.D.Fla.Loc.R. 56.1. Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts. *See Montount v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

homes was prohibited under a legal ruling in a case in which Nelson had been a party.[3] Roy later determined, however, that the case had been voluntarily dismissed with no judgment having been entered, which caused him to believe that Vogel and Nelson's statements were intended to dissuade him from proceeding with his subdivision. Further, Roy alleges that on October 6, 2004, defendant Charles C. Webb ("Webb"), sent an email to the County identifying ways in which the Roys' development failed to conform to the County's final development order, but this e-mail is not part of the record.[4] The Roys maintain that as a result of Webb's complaint the County issued a stop-work order, citing Roy's failure to obtain a building permit for construction of retaining walls.[5] No evidence supports this suggestion, either. The Roys have not introduced the stop-work order into the record, and the County denies having issued the stop-order.[6] Plaintiffs also claim Roy was forced to obtain a building permit for these retaining walls, but support for this contention is also missing from the record.

On or about December 15, 2004, County staff performed a final inspection of the construction and approved the release of the Roys' letter of credit. Roy then applied to the

---

[3]    Defendants Vogel and Nelson are married and own property adjoining Roy's property. Vogel is also a member of the Walton County Board of Adjustment ("BOA").

[4]    Defendant Webb is a resident of Walton County and a licensed general contractor. He owns property adjoining Chateaux de Paris in an adjacent subdivision.
       The Roys allege that prior to October 6, 2004, Webb took a number of actions to hinder development, including making numerous complaints to the County about Roy's activities, confronting the Roys' engineer and contractor, and harassing Roy by telephone. The Roys allege that these actions were all taken after Webb learned that Roy intended to market properties in his development to successful black professionals.
       It is undisputed that Webb and Roy had a falling out; both parties describe a heated conversation between Webb and the Roys' agent over a sewer line in August 2004, in which each claims to have been physically threatened by the other. Roy claims he never spoke to Webb after October 4, 2004, and he concedes that Webb's complaints to the County between October 2004 and May 2005 were disregarded by the County. Roy theorizes, however, that once "Mr. Webb hooked up with the other defendants through the agency of [Webb's attorney Kenneth Goldberg]," all defendants acted in concert to stall the development of Roy's property. (Doc. 286, at 3–4.)

[5]    The retaining wall referenced here is not the front privacy wall discussed *infra*. The front privacy wall is at the center of the parties' dispute.

[6]    There is also no mention of an October 2004 stop-work order in Roy's statement of facts or his opposition to defendants' statements of facts. (Docs. 261, 288).

Case No. 3:06cv95/MCR/EMT

Walton County Planning Division for approval of his subdivision plat.[7]  Final plat approval by the County's Planning Division was scheduled for May 24, 2005.  Between December 15, 2004, and February 25, 2005, Roy and various County staff had discussions about the progress of construction, including the front privacy wall.  During these discussions, Roy was advised by County officials that constructing a wall at the front property line would be acceptable and he would not need a permit for the construction so long as the wall was non-weight bearing.  Based on these discussions, Roy provided written notice to the County on February 25, 2005, of his intent to fence and gate the subdivision by placing fencing on top of the rear and side retaining walls and to build a privacy wall along the property line at the front of the subdivision.[8]  After providing the February 25, 2005, notice, Roy began construction of a masonry privacy wall at the front of the property, which encompassed nearly all of the linear frontage along Route 30A and required the removal of a strip of native vegetation on the property.

On May 11, 2005, Webb sent a letter to Kenneth Goldberg, his attorney,[9] complaining that Roy's development violated the County's zoning code.  After receiving Webb's letter Goldberg went to Blackshear's office to personally deliver Webb's complaints.[10]  The same day Blackshear dispatched two code enforcement employees to

---

[7]  Defendant Pat Blackshear ("Blackshear") was the Director of the Planning Division during the relevant time period.

[8]  Roy's notice stated that he was relying on assurances from Jim Harmon and Bill Bearden of the County's development inspection department that Roy could fence or wall his property up to the property line and replace any disturbed vegetation after construction. Although the County concedes these representations were made to Roy, it maintains the representations were incorrect insofar as they related to the front privacy wall.

[9]  According to the Roys, Webb engaged Goldberg to represent him in his opposition to the Roys' project. The Roys assert that while all defendants sought to block his project, Goldberg was the "hinge" in a conspiracy between the defendants to further their common, racially-motivated objective to stop the development altogether. According to the Roys, Nelson and Vogel were secret clients of Goldberg and through relationships he maintained with various County staff, Goldberg was able to accomplish more than any of the defendants could on their own as far as hindering the Roys' development efforts.

[10]  The following day, May 12, 2005, Goldberg memorialized Webb's complaints in a letter e-mailed to the County at Blackshear's request. According to Goldberg and Webb, the Roys violated the zoning codes by building a wall; building in the setback zone; removing native vegetation; constructing cement columns; failing to comply with the drainage plan; and constructing a structure (*i.e.,* the wall) wider than 65% of the linear frontage. The only complaints relevant to this case are those related to the front privacy wall, namely,

the Roys' property to investigate and asked them to post a stop-work order if there were indeed violations. The staff visited the property that day and found violations for which they issued a stop-work order. According to the County, the Roys' property lies in the "Route 30A scenic corridor" as established by the County's Comprehensive Land Use Plan and implemented under its Land Development Code. The rules of the Land Development Code provide that native vegetation must be planted by the roadside and structures must be set back a specific distance from the roadway and limited to a width of 65% of the linear frontage on the roadway.[11]  The stop-work order was issued because, according to the County, the Roys' privacy wall violated these specific buffer requirements and the rules protecting native vegetation.

The stop-work order had limited effect, as it only prohibited work on the wall and in the native vegetation zone. The Roys were not prevented by the order from installing roads, infrastructure, or other upgrades. They were not, however, able to sell or develop

---

the setback violation and the removal of native vegetation.

[11]   The Roys dispute that the property lies in the Route 30A scenic corridor and thus argue that the buffer restrictions do not apply. Although the Roys recognize that the purpose of the corridor, according to the Land Development Code, "shall be to preserve and maximize views of the Gulf of Mexico, to enhance the visual characteristics of the roadway corridor, and to eliminate roadside clutter" (*see* Walton County Land Development Code § 13.02.00.A), they take the position that the property is excluded from the corridor restrictions because Chateaux de Paris is on the north side of the highway and the Gulf of Mexico lies entirely to the south. The court rejects this interpretation of the Land Development Code. As the County correctly notes, the Roys' argument flies in the face of language from the very next code section which provides that "[a]ll properties that are located contiguous to County Road 30A" are part of the corridor. *See id.* at § 13.02.00.B. Whether on the north side or south side of the road, the Roys' property is clearly part of the 30A corridor. The court further notes that the Roys have never presented this argument to any County or state governmental or judicial body.

Plaintiffs repeatedly argue that the County's interpretation of its Land Development Code is erroneous and suggest that this somehow serves as evidence of racial animus in this case. First, as the County points out, some of the code interpretations the Roys now challenge as erroneous unambiguously appear on the face of the development order Roy sought and signed—most notably the designation of the property as being located within the Route 30A scenic corridor and subject to certain setbacks. Additionally, it is undisputed that the Roys never appealed any contrary interpretations or adverse decisions of which they now complain to any appropriate County or State body. The evidence shows the decisions of County staff, if incorrect, could have been appealed to the Board of County Commissioners or challenged before the Walton County Circuit Court. Moreover, even if the County's interpretation of the code were deemed arbitrary and capricious for due process purposes, a finding not made here, in the absence of evidence of racial animus the County's actions would not rise to the level of a cognizable federal civil rights claim. In this case, as discussed *infra*, there is absolutely no evidence in the record suggesting racial animus in connection with any of the County's code interpretations.

Case No. 3:06cv95/MCR/EMT

lots during this time because their plat application had not yet been approved. Consideration of the application had been set for the Planning Division's May 24, 2005, meeting, but following the issuance of the stop-work order County staff removed the plat application from the agenda.  The County claims the application was removed from the agenda because the Land Development Code provides that no orders may be issued for development when a stop-work order is pending.  Nonetheless, shortly after the plat application was removed from the agenda, defendant Blackshear, as Planning Director, made the decision to grant relief to the Roys from this part of the code.  Blackshear felt responsible for the confusion the County staff had caused the Roys, and thus she decided to interpret the stop-work order as relating only to the privacy wall.  As a result, the plat application was placed back on the Planning Division's July 2005 meeting agenda.  The application was approved at this meeting, clearing any impediments to the Roys' ability to fully market and develop their property.[12]  The County acknowledges the two-month delay that may have slowed home construction in the subdivision, but it insists that this was the only impediment experienced by the Roys at any time, with the exception of the prohibition concerning the wall itself.  Indeed, it is undisputed that, after the July 2005 plat approval, the Roys were never prohibited from developing the subdivision's lots and marketing them to whomever they desired.

Prior to the plat approval, and in response to the Roys' complaints about their application being withdrawn from the May 2005 agenda, the Planning Division sent Roy a letter on June 3, 2005, advising him of the need to comply with the Land Development Code's buffer requirements and suggesting three options: (1) remove the privacy wall and replant the native vegetation he had removed; (2) apply to the BOA for a variance; or (3) appeal the County's May 11, 2005, stop-work order—presumably to the Board of County Commissioners or a state circuit court.  Roy chose to file a petition for a variance with the

---

[12]     The County cites certain sections of the Land Development Code that explain why no further action can be taken when a stop-work order is pending at a development project.  The County cites no support, however, for Blackshear's decision to proceed with plat approval in disregard of these prohibitory code sections.  Although Blackshear's decision appears to have been procedurally irregular, the court notes that it operated only to the Roys' advantage, not their disadvantage. This evidence of Blackshear's conduct therefore does not aid the Roys; rather the contrary is true: it tends to show the lack of any discriminatory animus on Blackshear's part.

Case No. 3:06cv95/MCR/EMT

BOA, which he did on June 21, 2005. A hearing on the petition was scheduled for September 22, 2005.[13]

On September 20, 2005, on behalf of Webb, Goldberg filed a motion to dismiss Roy's variance petition for lack of jurisdiction with the BOA.[14] Before considering the variance petition, the BOA heard argument on the motion from Goldberg, County staff, and Roy. Goldberg argued that the variance petition could not be heard by the BOA because Roy was seeking an exception to the Comprehensive Plan, which could only be granted by the Board of County Commissioners. According to Goldberg, the BOA did not have the authority to permit the Roys to build the wall in the setback zone in contravention of the Comprehensive Plan. After hearing argument on the motion to dismiss, the BOA deferred a decision on the motion to dismiss and tabled Roy's variance petition.

During a recess of the BOA meeting and after the hearing on the motion to dismiss, County Attorney David Hallman ("Hallman") told Roy that in light of the procedural difficulties he had encountered, namely the conflicting advice he had received from County staff regarding his ability to construct the front privacy wall, he would recommend that an "estoppel letter" be issued from the Planning Division allowing construction of Roy's privacy wall to go forward. The estoppel letter was issued by Blackshear on November 3, 2005. In the letter, the County admitted that some of its staff had erroneously represented to Roy that he could construct the privacy wall at the property line. Because these representations had been made prior to the construction of the front wall, the County concluded the Roys should be permitted to reasonably rely on them. Thus, according to the letter, the County would not enforce violations of the wall "as proposed." The letter also provided that any person adversely affected by the letter could appeal it to the BOA within thirty days.

On November 28, 2005, Goldberg filed, by e-mail to the Planning Division, an appeal of the estoppel letter contesting the Division's authority to issue the letter. Under Goldberg's interpretation of the Land Development Code, only the Board of County

---

[13] This was Vogel's first meeting as a member of the BOA. He recused himself on the matter of the Roys' variance.

[14] The parties agree this motion was initially filed on September 20, 2005, and amended on September 22, 2005, prior to the BOA meeting that day. Roy claims he did not receive this motion until the meeting.

Case No. 3:06cv95/MCR/EMT

Commissioners could make an estoppel determination. Accordingly, Goldberg argued, the estoppel letter had been issued without legal authority. Goldberg followed up with a second e-mail on December 19, 2005, requesting that a new stop-work order be issued and the matter be brought before the BOA for hearing. County Attorney Hallman then determined that the matter should be placed on the BOA agenda and that Roy should be given appropriate notice.[15] The next day, December 20, 2005— pending the BOA's decision on the estoppel letter— another stop-work order was issued and posted on the Roys' property. As did the May 2005 order, this order cited Roy for clearing the native vegetation zone and building a wall in the scenic corridor; it did not purport to prohibit the Roys from developing any other part of the property.[16] By this time the Roys' plat application had been approved for over five months.

Roy received actual notice of the stop-work order when it was posted on December 20, 2005, but Roy claims he did not receive the November 3, 2005, estoppel letter until January 2006 and only after it was forwarded to him by a neighbor. On January 6, 2006, through counsel, Roy faxed written notice to Blackshear that he understood the estoppel letter to mean all stop-work orders were no longer in effect and that he intended to rely on the letter to complete the front privacy wall.[17] On January 9, 2006, however, the County issued and sent, by certified mail to Roy's address in Georgia, an "amended notice of

---

[15]   The Roys originally contended that the appeal was untimely, that Roy was not given notice of the appeal, and that no appeal was ever filed. The argument that the appeal was untimely relied on the fact that Goldberg's December 19, 2005, e-mail was sent more than thirty days after the estoppel letter was issued. The Roys also complained that the County improperly considered this e-mail only after Goldberg had made an oral request for an extension of time, for which there is apparently no provision in the County's zoning codes. Webb responded that the December 19, 2005, e-mail was sent within thirty days of his receipt of notice of the estoppel letter.
    None of these arguments are relevant in light of the fact that Goldberg sent the first e-mail on November 28, 2005, which was within the thirty day period. As to whether Roy received notice of the appeal, the record does not clearly show whether Roy had the opportunity to contest the appeal, but in light of the County's determination that it was simply without authority to issue the estoppel letter, the court finds there was nothing for Roy to contest.

[16]   The order stated in full: "All work within the native vegetation preservation zone and the Route 30A scenic corridor setback must cease immediately."

[17]   The Roys' attempt to rely on the estoppel letter to terminate all stop-work orders when they knew the County had later issued a stop-work order (*i.e.,* in December 2005, one month after the November 2005 estoppel letter) was disingenuous.

violation" reaffirming the December 2005 stop-work order.  This notice again cited the setback and native vegetation violations and gave Roy thirty days in which to comply.[18]

After communicating with Roy and his counsel, Blackshear scheduled a final meeting to discuss the matter.  The meeting was held on February 2, 2006, and was attended by Blackshear, Hallman and other County staff, Roy, Mrs. Roy (by telephone), Roy's brother, Nelson, and Goldberg; according to the defendants, Goldberg stated to all present that he was in attendance on behalf of Webb.[19]  At the meeting, Hallman informed the Roys that the estoppel letter would be rescinded based on his determination that the Planning Division did not have the authority to issue it.  Hallman also told the Roys the County would prepare a new letter regarding the status of the development.  On hearing this, Roy became upset and left the meeting, leaving his attorney behind.  Roy waited outside the County's offices, where he observed Goldberg and Nelson having a conversation after the meeting ended.  The Roys suggest this is further evidence of a conspiracy but Nelson claims the conversation was innocent and was conducted in the usual course of her long friendship with Goldberg.

On March 6, 2006, the Roys filed their initial complaint in this court.  They have since been permitted to amend the complaint three times.  On defendants' prior motions, the court dismissed several of the Roys' claims with prejudice and others without prejudice.  Four claims now remain: Count III, 42 U.S.C. § 1981 (equal right to make and enforce

---

[18] The difference between an amended notice of violation and a stop-work order is not clear to the court. Both appear to have the effect of ordering a halt to specific construction activities, but the notice of violation also gives the property owner a set number of days for compliance, with the risk of a daily monetary penalty of up to $500 for failing to comply. There is no evidence the County ever enforced the monetary penalty against the Roys.

[19] Roy did not expect to see anyone other than County staff at the meeting, particularly Nelson and Goldberg, because he believed the matter was private. Roy insists that Nelson and Goldberg's attendance at the meeting is further evidence of the conspiracy against him. In response, Nelson maintains she heard of the meeting only because she happened to be meeting with Blackshear about an unrelated matter immediately before the meeting. Defendants claim Goldberg found out about the meeting "accidentally," by proposing to meet with Blackshear at the same time on another matter, and learning from Blackshear's assistant that Blackshear would be busy due to the meeting with the Roys; Goldberg then asked Blackshear if he could attend.

contracts), against all defendants except the County[20]; Count IV, 42 U.S.C. § 1982 (equal right to hold and enjoy property), against all defendants; Count VI, 42 U.S.C. § 1985(3) (conspiracy to violate civil rights), against all defendants; and Count VII, 42 U.S.C. § 3604 (Fair Housing Act), against all defendants.

**STANDARD OF REVIEW**

A motion for summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A factual dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Anderson*, 477 U.S. at 248; *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted). Nevertheless, a general denial unaccompanied by any evidentiary support will not suffice. Fed.R.Civ.P. 56(e)(2); *see, e.g., Courson v. McMillian*, 939 F.2d 1479 (11th Cir. 1991); *Hutton v. Strickland*, 919 F.2d 1531 (11th Cir. 1991). Furthermore, the court is not obliged to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *See Anderson*, 477 U.S. at 249. To

---

[20] The Roys incorrectly assert that Count III remains viable against the County. As noted in the court's November 9, 2007, order on the motions to dismiss, the court previously dismissed this count against the County with prejudice. *See* doc. 51 at 25 and doc. 156 at 14, n.30.

Case No. 3:06cv95/MCR/EMT

avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Indeed, the existence of a scintilla of evidence in support of the nonmovant's position is insufficient; the test is "whether there is [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Id.* at 252. The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *See Adickes,* 398 U.S. at 157; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Once the movant satisfies its burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (emphasis omitted). Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

**DISCUSSION**

<u>Counts III, IV, and VI: 42 U.S.C. §1981, §1982, and §1985(3)</u>

To prevail on a claim under §1981, §1982, or §1985, a plaintiff must prove intentional discrimination on the basis of race. *See Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982) (§ 1981); *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1543 (11th Cir. 1994) (§ 1982); *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996) (§§ 1981 and 1982); *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971) (§ 1985). Because intentional discrimination is required, a mere "showing of disparate impact through a neutral practice is insufficient"; rather, the plaintiff must show "purposeful discrimination." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999). To establish purposeful discrimination under § 1981 and § 1982 a plaintiff must show that, under similar circumstances, the defendant treated a white individual differently than it treated him. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007), *aff'd on other grounds*, 128 S.Ct. 1951 (2008) (§ 1981); *Burke-Fowler v. Orange County, Fla.*,

447 F.3d 1319, 1324–26 (11th Cir. 2006) (§ 1981); *Lawrence v. Courtyards at Deerwood Ass'n, Inc.*, 318 F. Supp.2d 1133, 1148 (S.D. Fla. 2004) (§ 1982). Intentional discrimination may be proven through (1) direct evidence, (2) circumstantial evidence, or (3) statistical proof. *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008).

The court has thoroughly reviewed the record in this case for any evidence of purposeful racial discrimination on the part of any defendant in this case. There is none. In fact, the record is crystal clear that as of July 2005, when the Roys' plat application was approved, nothing the County or the individual defendants had done interfered with, hampered, impeded, or delayed the Roys' ability to develop and market their property to whomever they wished. Furthermore, subsequent to July 2005 the only thing the Roys were prevented from constructing was the front privacy wall, a prohibition which did not implicate a civil right, much less the violation of a civil right. Moreover, there is nothing in the record to suggest that issuance of the May 11, 2005, stop-work order and removal of the plat application from the May 2005 BOA agenda was racially motivated. The Roys have not shown that, under circumstances similar to those alleged in this case, the County treated a white developer differently than it treated them, *i.e.*, the Roys have come forward with nothing that shows a white developer who built in the scenic corridor setback zone received more favorable treatment by the County than did the Roys. Here, there is absolutely no credible comparator evidence.[21]

Even if the plaintiffs were not required to come forward with evidence of a white comparator on their § 1981 and § 1982 claims, they have failed to rebut the defendants' articulated non-discriminatory reason for issuing the stop-work orders and removing their plat from the May 24, 2005, meeting agenda.[22] More specifically, the Roys' construction

---

[21] To satisfy their burden of introducing a comparator, the Roys might have produced evidence of a white developer who sought and received a variance of the type denied to them, evidence of a white developer who was permitted to build in the scenic corridor setback zone despite arguable code violations, or other plausible evidence of disparate treatment, but they did not. In fact, they have identified no other property owner or developer for comparison at all.

[22] To show intentional discrimination through circumstantial evidence, the Roys may use the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263,

of the front privacy wall violated the specific setback and vegetation protection requirements of the Land Development Code. Plaintiffs' fanciful arguments notwithstanding, the front privacy wall construction unquestionably violated these requirements.[23]  Nonetheless, even if Webb, Goldberg, and the County were incorrect in their determination that the wall violated the buffer and vegetation requirements their error does not equate to intentional discrimination. *Cf. E&T Realty v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987) ("[m]ere error or mistake" or "[e]ven arbitrary administration" of a statute does not amount to intentional discrimination).  There is simply not one shred of evidence of pretext on the record before the court.  Indeed, the Roys have come forward with absolutely no credible direct or circumstantial evidence, or statistical proof, of any intentional discrimination whatsoever.  *Rioux*, 520 F.3d at 1274.  The Roys' claims pursuant to § 1981 and § 1982 therefore are completely without merit.

Likewise, there is no proof of a conspiracy in this case.  Section 1985 protects only "the right to be free from being a victim of independent illegality," but the Roys cannot show that defendants are liable under § 1981 or § 1982 and there can be no conspiracy without an underlying illegal act.  *See Poirier v. Hodges*, 445 F.Supp. 838, 845 (M.D. Fla. 1978). Moreover,  § 1985 requires proof of a conspiracy, or agreement, between the defendants. *Dickerson v. Alachua County Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000).  The Roys have presented no credible factual evidence of an agreement, only allegations which are

---

1272–73 (11th Cir. 2000) (*per curiam*).  Under this framework, a plaintiff must first present sufficient evidence to establish a *prima facie* case of intentional discrimination.  *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824.  If a *prima facie* case is established, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  *Id.*  If the defendant does so, the burden shifts back to the plaintiff to show that the reason was merely pretextual.  *Id.*, 411 U.S. at 804.

[23]    According to the Roys, there are multiple "*prima facie* cases" under which intentional discrimination may be established.  Some of the Roys' theories are not applicable—for example, disparate impact does not prove an intentional discrimination claim under §§ 1981, 1982, or 1985—and others are puzzling to the court, such as the Roys' distinction between "denial of benefit" and "imposition of penalty" outcomes or their complaint that defendants have proven no "violation of rule."

Additionally, the Roys argue at length about procedural irregularities in the County's processes.  In fact the court initially had concerns about some of these irregularities; however, on review of the record it is obvious that any such procedural irregularities operated only to the Roys' benefit.

Case No. 3:06cv95/MCR/EMT

insufficient to rebut the defendants' denials.[24]  Thus the Roys' § 1985 claim also is without merit.[25]

For all of the foregoing reasons, plaintiffs' claims pursuant to 42 U.S.C. §1981, §1982, and §1985(3) fail.   Defendants' motions for summary judgment on Counts III, IV, and VI are therefore granted, and plaintiffs' cross-motion is denied.

<u>Count VII: Fair Housing Act Violations with Disparate Impact</u>

Count VII of the third amended complaint alleges that each defendant is liable for violating the Roys' rights under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq*. The court previously dismissed some of the Roys' FHA claims, leaving only their claim under § 3604(a), which makes it unlawful "[t]o . . . make unavailable or deny[ ] a dwelling

---

[24]    The Roys' conspiracy allegations are based on the following. When Goldberg was a defendant in this case he submitted an affidavit in which he denied representing "any other party" than Webb. The Roys insist this contradicts a statement contained in a truncated, 10-second video clip purportedly showing Goldberg at the September 22, 2005, BOA meeting. In the video, an unidentifiable man is filmed from behind saying, "My name is Ken Goldberg, I represent several homeowners in Tranquility Shores and Gulf Vista, which are the neighboring subdivisions to this particular project—." The Roys insists Goldberg must have been referring to Nelson and Vogel because they live in Gulf Vista; thus, at oral argument, Roy's counsel claimed that Goldberg must have been "lying" either in the affidavit or at the BOA meeting. Second, Roy asserts there is evidence of a conspiracy because Goldberg and Nelson both attended this meeting, where they sat together, and they also attended the February 2, 2006, final meeting at the County's offices.

The court cannot consider the video clip purportedly depicting Goldberg; it is inadmissible because there is no testimony in the record to authenticate it and it is not self-authenticating. Fed.R.Evid. 901, 902. Even if the evidence were admissible, however, the court finds it is utterly insufficient to give rise to an inference that Goldberg lied, thus casting doubt on his credibility. Goldberg's "several homeowners" could have been any number of people other than Nelson and Vogel. Moreover, in his affidavit Goldberg avers that in connection *with this matter* he represented no party other than Webb. There is simply no contradiction, as the Roys claim, between Goldberg's denial that he represented any other party in this lawsuit and any statement that he represents several other homeowners. Additionally, there is nothing nefariouis in Nelson and Goldberg's appearance at the BOA meeting; Roy *himself* sent the notice of the meeting to Nelson and Webb, Goldberg's client, because they were nearby landowners affected by Roy's variance petition.

The court simply cannot credit the implication that two private citizens, each with a longstanding interest in land use issues, must have engaged in a conspiracy because they both attended a public meeting on land use.  As to Nelson and Goldberg's attendance at the February 2, 2006, meeting Blackshear arranged, the court finds these individuals have offered justifiable explanations for their attendance which Roy has not rebutted, as is his burden.  While their attendance may not have been expected or invited by Roy, that does not translate into evidence of a conspiracy to deprive the Roys of their constitutional rights.

[25]    Given that plaintiffs have failed to establish a constitutional violation, the court agrees with Blackshear that she is entitled  to qualified immunity in connection with the constitutional claims against her. *See Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

to any person because of race . . . or national origin." The court permitted the Roys' § 3604(a) claim to go forward on a theory of disparate impact only.

The Roys fail to specifically identify any facially neutral policy of the defendants in support of their FHA disparate impact claim, a necessary element of any FHA disparate impact *prima facie* case. *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir. 1988) (stating that a disparate impact claim is a challenge to a facially neutral policy that "actually or predictably results in . . . discrimination" against an identifiable group.). There can be no discriminatory impact of a facially neutral policy to consider if none is alleged. The closest the Roys come to identifying any facially neutral policy of the defendants is by referring to their having made "the decision," without identifying what is meant by "the decision" or who made "the decision"; nothing in Count VII identifies anything more than "Defendants' actions" as the object of the Roys' FHA challenge. Thus, summary judgment in defendants' favor on Count VII is appropriate.

The court notes that even if the analysis of the FHA claim proceeded in the absence of any identified policy, the Roys' FHA claim would still be subject to summary judgment. This is so because the Roys have failed in their effort to show, by statistical proof, that the defendants' actions had a disparate impact on blacks in Walton County. [26] Viewing the

---

[26] The Roys make a highly confusing and convoluted statistical argument, which the court briefly summarizes as follows. Route 30A runs through two census block groups numbers which are subdivisions of another, larger census tract. The Roys' property is located in only one of the block groups, but the Roys combine the two block groups together for analytical purposes. According to the Roys, the proportion of stop-work orders issued along Route 30A should mirror the population of their selected area. Because the ratio of whites to blacks in that area is 94.0% to 0.4%, they claim there should be 235 times as many stop-work orders issued to whites as to blacks, or 460. No stop-work orders, however, were issued to anyone on Route 30A from January 2005 to February 2008, other than to the Roys. The Roys argue this is "sufficiently glaring" proof of discriminatory intent and impact.

The Roys' argument fails on factual, logical, and legal grounds. First, it lacks valid data. The record in fact reflects that twelve stop-work orders were issued to properties along Route 30A during 2004-2006, ten of which were issued during the time period selected by the Roys. These stop-work orders are indistinguishable from those issued to the Roys. Moreover, the Roys' analysis is invalid because relies solely on stop-work orders issued along Route 30A only. It is possible that hundreds of stop-work orders were issued to white property owners who resided within the selected block groups but not on Route 30A.

Additionally, the Roys' argument makes the unexplained, unwarranted assumption that the stop-work orders should be issued at a rate mirroring the general population. Without explaining why population is a proper proxy for development projects, the Roys' argument lacks any foundation. *Hallmark Developers*, 466 F.3d at 1286 (holding "statistics based on the general population [should] bear a proven relationship to the actual applicant flow"). The Roys' statistical theory also disregards other, legitimate explanations for the

record in the light most favorable to the Roys, as it must, the court finds that in presenting their case, specifically their statistical case, the Roys have failed to satisfy their burden of coming forward with some evidence to show there is a genuine issue of material fact as to any disparate impact upon blacks as a group. *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574–78 (2d Cir. 2003) (failure to establish statistical case or any qualitative comparison between populations insufficient to show FHA violation); *United States v. Nichols*, 512 F.3d 789, 795 (6th Cir. 2008) ("bald accusations and irrelevant generalized statistics do not even come close to constituting" a *prima facie* case of equal protection violation).

Remaining for disposition are the defendants' motions for leave to amend to amend their answers to include an affirmative defense under the *Noerr-Pennington* doctrine.[27] In light of the court's determination that defendants' motions for summary judgment should be granted and plaintiffs' cross-motion for partial summary judgment should be denied, the motions are denied as moot.

In closing, the court feels compelled to make the following comments on the course of litigation and conduct of this case, which has now been pending on the court's docket

---

apparent "disparity" in number of stop-work orders issued, such as that properties under active development are cited more frequently than properties whose development is already complete. *See Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 319 (7th Cir. 2003) (noting the Supreme Court has instructed courts to "examin[e] all of the surrounding facts and circumstances which create the statistics themselves").

The Roys also make legally insufficient allegations of disparate impact without offering any evidence showing that blacks as a group will be affected. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir. 2008) ("simply showing that a few houses are affected by an ordinance does not come close to establishing disparate impact"). Additionally, the Roys must show—but have failed to do so other than by speculation—the race of those who would have occupied the housing were it not for the challenged action. *Hallmark*, 466 F.3d at 1286. Finally, the Roys' analysis also requires the court to consider numbers so small as to be statistically insignificant. The Roys' approach requires extrapolating, from very small figures, the implication of unlawful discrimination and discriminatory impact. Such an extrapolation simply cannot be supported by this record. *See Smith v. Xerox Corp.*, 196 F.3d 358, 369 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006) (noting that "[i]n any large population a subset can be chosen that will make it appear as though the complained of practice produced a disparate impact").

[27]   *See Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

Case No. 3:06cv95/MCR/EMT

for over three years. In fairness, the court acknowledges that some of the delay can be attributed to its heavy docket. Nevertheless, the court is also persuaded that counsel for plaintiff persisted in pursuing untenable legal theories and arguments based on unsupported facts long after it should have been apparent to him that any reasonable basis for proceeding with this case did not exist. This unfortunate conduct by plaintiffs' counsel resulted in the waste of scarce judicial resources, as well as the defendants' resources.

Accordingly, it is ORDERED:

1. Defendants' motions for summary judgment (docs. 250, 251, 252, and 254) are GRANTED.

2. Plaintiffs' motion for partial summary judgment (doc. 259) is DENIED.

3. Defendants' motions for leave to amend their answers (docs. 294, 297, and 299) are DENIED as moot.

4. The clerk is directed to enter judgment in favor of all defendants and to close this case.

**DONE and ORDERED** this 31st day of March, 2009.

 s/ *M. Casey Rodgers*
 **M. CASEY RODGERS**
 **UNITED STATES DISTRICT JUDGE**